**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**vs.**

**ASSETS DESCRIBED AND LISTED IN ATTACHMENT A,**

**Defendants *In Rem*.**

______________________________________/

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, the United States of America, by and through its undersigned counsel, files this Verified Complaint for Forfeiture *In Rem*, to allege, upon information and belief, as follows:

## I. INTRODUCTION AND DEFENDANTS *IN REM*

1. This is a civil action *in rem* to forfeit the following real properties, including all buildings, fixtures, appurtenances, improvements, attachments and easements found therein or theron (and hereinafter referred to as the "**Defendant Properties**"):

(i) 5555 Collins Avenue, Unit 12A, Miami Beach, Florida 33140 ("**Defendant Property 1**");

(ii) 12210 SW 103rd Terrace, Miami, Florida 33186 ("**Defendant Property 2**"); and

(iii) 8470 Marsh Street, Placida, Florida 33946 ("**Defendant Property 3**").

2. As alleged herein, the **Defendant Properties** are subject to forfeiture, pursuant to 21 U.S.C. § 881(a)(6), as property traceable to the proceeds of federal narcotics trafficking offenses that occurred in the Southern District of Florida. The **Defendant Properties** are also subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(A) and 31 U.S.C. § 5317(c), as property

involved in federal structuring and money laundering offenses that occurred in the Southern District of Florida and elsewhere, and/or as property traceable to such property.

## II. JURISDICTION AND VENUE

3. Pursuant to 28 U.S.C. §§ 1345 and 1355(a), this Court has jurisdiction over this subject matter.

4. The **Defendant Properties** have not been seized. In accordance with 18 U.S.C. § 985(b)(1) and (c)(1), the United States will file notices of *lis pendens*, post notices of this action and a copy of the complaint on each of the **Defendant Properties**, and serve notice on the title owner along with a copy of the complaint.

5. Pursuant to 28 U.S.C. §§ 1355(b) and 1395, this Court has venue as the acts or omissions giving rise the forfeiture occurred in this District, and because two of the **Defendant Properties** are located in this District.

## III. FACTUAL ALLEGATIONS

### A. Oxycodone and "Pill Mills"

6. Oxycodone is classified as a Schedule II controlled substance under the Controlled Substances Act, 21 U.S.C. § 801, *et seq*., and its implementing regulations.

7. Schedule II drugs, such as oxycodone, have a recognized medical use, but their administration must be closely supervised because of the high incidence of abuse or misuse of such drugs. In order to prescribe oxycodone, physicians must be both lawfully licensed to practice medicine and registered with the Drug Enforcement Administration ("DEA").

8. Oxycodone is a potent and addictive opioid that is similar to morphine, codeine, and hydrocodone. As a prescription analgesic, oxycodone is known by the brand names

Roxicodone and OxyContin, and available mixed with other substances under the brand names Percocet, Roxicet, Tylox, Percodan.

9. Oxycodone pills are highly sought after by drug addicts and drug trafficking organizations, and are often diverted for illicit use and distribution. They are extremely profitable when re-sold in street-level distribution. Street names for oxycodone tablets include "Oxys," "Roxis," "thirties" or "blues" (referring to 30-milligram ("mg") pills), and "fifteens" or "greens" (referring to 15-mg pills).

10. As early as in or around 2010, one 30-mg oxycodone tablet, which cost approximately $1 to $5 in South Florida, could be quickly and easily re-sold in other states, including Kentucky, Ohio, and Tennessee, for approximately $20 and up to $40, resulting in profits of approximately $15 to $39 per dose, or approximately $2,700 to $7,020 per 180-dose bottle.

11. Drug addicts and diverters often obtain oxycodone pills through pain management clinics, commonly referred to as "pill mills." Pill mills are generally more sophisticated than traditional, street-level narcotics distributors, and such businesses maintain a façade that includes storefronts, examining physicians, and recordkeeping in compliance with applicable law. For example, many pill mills in South Florida refuse to see patients without a medical resonance imaging ("MRI") report, a patient profile (a printout from a pharmacy showing the patient has previously received controlled substances), or Florida-issued identification (showing Florida residency). However, even when presented with MRI reports showing no significant pathology warranting pain medication, pill mill practitioners will still prescribe strong narcotic drugs.

12. In an effort to avoid law enforcement scrutiny, pill mills usually operate as cash businesses that do not accept, or limit payment from, private health care insurance, Medicare, Medicaid, or credit cards.

**B. Dr. Falcon and PCCB**

13. Since in or around March 2011, Dr. Armando A. Falcon ("Dr. Falcon") has owned and operated the Pain Center of Cutler Bay ("PCCB"), a pain management clinic located in Miami-Dade County, Florida, which is within the Southern District of Florida.

14. Dr. Falcon is a U.S. citizen whose residence is located at 12210 SW 103rd Terrace, Miami, Florida, which is **Defendant Property 2**. He is a medical doctor that has been registered with the DEA since at least 2002.

15. PCCB is a Florida corporation that was incorporated in or around February 2011. On Florida corporate records, Dr. Falcon is listed as PCCB's registered agent and president.

16. In or around March 2011, the Florida Department of Health issued a pain management clinic license to PCCB. The application for the license identified Dr. Falcon as PCCB's owner and medical director.

17. PCCB is open from Monday through Thursday, from approximately 9 a.m. to 2 p.m. Dr. Falcon is the only physician at PCCB, and at least two employees assist him there.

18. Dr. Falcon and these two employees conspired with each other to unlawfully distribute and dispense controlled substances. Dr. Falcon prescribed oxycodone pills to patients outside the course of professional practice and without a legitimate medical purpose, and his two employees assisted him in doing so.

19. In or around February 2016, state and federal law enforcement agents received an anonymous tip that Dr. Falcon was prescribing high dosages of oxycodone without a legitimate medical purpose.

20. A query of databases tracking prescriptions confirmed that, between in or around January 2011 and in or around June 2017, Dr. Falcon was prescribing large quantities of 30-mg

pills of oxycodone, a dosage and drug which are highly sought after by illicit drug users and drug trafficking organizations.

21. As part of the subsequent investigation initiated by DEA agents and task force officers, an undercover officer (the "UC") and two confidential sources ("CS-1" and "CS-2") visited PCCB approximately 15 times, posing as patients for Dr. Falcon.

22. During their visits, starting in or around June 2016 and continuing through in or around April 2018, the UC, CS-1, and CS-2 obtained illegal prescriptions from Dr. Falcon for controlled substances, including medication containing a mixture or detectable amount of oxycodone.

23. Two employees at PCCB facilitated the distribution of the narcotic pain medication, coaching the UC, CS-1, and CS-2 on how to obtain illicit prescriptions, and collecting approximately $250 in cash for each visit.

24. In or around April 2018, a third confidential source ("CS-3"), a patient of Dr. Falcon from in or around 2012 through in or around 2016, told agents that Dr. Falcon would prescribe him or her oxycodone without medical need. CS-3 reported that he or she also paid Dr. Falcon approximately $250 per visit, and that Dr. Falcon would see approximately 20 patients *within a two-hour timespan* each business day.

25. Based on the investigation and an analysis of Dr. Falcon's prescribing history during the course of the conspiracy, Dr. Falcon is estimated to have obtained approximately $6,000 in daily cash proceeds, or approximately $1 million in cash annually. Over the course of PCCB's operation, which was opened in 2011, Dr. Falcon acquired more than $7 million in proceeds.

C. **Laundering and Structuring of Cash Narcotics Proceeds**

26. A review of financial records has revealed that PCCB's cash proceeds were deposited into business and personal accounts that Dr. Falcon owned and controlled. From 2015 to present, more than $900,000 *in cash* was deposited into three such accounts.

27. By depositing cash not only directly into a business account, but also into his personal accounts, Dr. Falcon sought to conceal or disguise the nature, location, source, ownership, or control of his illicit narcotics proceeds.

28. The vast majority of these cash deposits, both into personal and business accounts, were less than $10,000 in value, and appear to have been structured in this manner to avoid federal reporting requirements that mandate domestic financial institutions file a currency transaction report ("CTR") for every transaction involving U.S. currency in excess of $10,000.

29. For instance, between on or about March 6, 2015 and on or about October 25, 2017, when the account closed, a total of approximately $304,594.99 in cash was deposited in about 64 transactions into a personal account at TD Bank with an account number ending in 1804 ("Falcon TD Bank Account No. 1804"). During this two-year time period, none of the cash deposits into Falcon TD Bank Account No. 1804 exceeded $10,000 in value.

30. Falcon TD Bank Account No. 1804 was held in the name of Dr. Falcon, who was an account signatory. Dr. Falcon's children were also added as account signatories in or around January 2017, before the account closed later that year.

31. In addition, between on or about January 4, 2016, and on or about May 15, 2018, approximately $231,415 was deposited in about 50 transactions into a personal account at Bank of America with an account number ending in 8072 ("Falcon BoA Account No. 8072"). Again,

during this two-year time period, none of the cash deposits into Falcon BoA Account No. 8072 exceeded $10,000 in value.

32. Falcon BoA Account No. 8072 is held in the name of Dr. Falcon, who is the sole account signatory.

33. As these cash deposits were being made into Dr. Falcon's personal accounts, significant amounts of cash were also being deposited into a business account held by PCCB at Bank of America with an account number ending in 1574 ("PCCB BoA Account No. 1574").

34. In 2016, cash deposits into PCCB BoA Account No. 1574 totaled approximately $187,521, and in 2017, they totaled approximately $157,072. In the first half of 2018, cash deposits into PCCB BoA Account No. 1574 totaled more than $45,140. Each of these cash deposits was less than $10,000 in value.

35. These deposits into the PCCB BoA Account No. 1574 further underscore the unusual nature of the cash deposits into Dr. Falcon's personal accounts. Rather than simply transfer funds from his business account to personal accounts, Dr. Falcon structured narcotics proceeds into individual cash deposits into both business and personal accounts so that each cash transaction involved less than $10,000.

**D. <u>Acquisition and Maintenance of Defendant Properties</u>**

36. Once narcotics proceeds were deposited into Falcon TD Bank Account No. 1804 and Falcon BoA Account No. 8072, they were commingled with other funds, and then used to purchase and/or maintain the **Defendant Properties**.

### *1. Defendant Property 1: Miami Beach Condo*

37. Specifically, on or about May 4, 2015, a $20,000 check from TD Bank Account No. 1804 funded Dr. Falcon's purchase of **Defendant Property 1**, which is real property located at 5555 Collins Avenue, Unit 12A, Miami Beach, Florida.

38. In addition, between on or about September 10, 2015, and on or about August 9, 2017, six additional checks from Falcon TD Bank Account No. 1804 totaling approximately $18,363.45 paid for **Defendant Property 1's** condominium and home owner association fees.

39. Also, between on or about July 20, 2016, and on or about February 24, 2017, funds from Falcon BoA Account No. 8072 totaling approximately $8,123.55 paid for **Defendant Property 1's** condominium and home owner association fees.

### *2. Defendant Property 2: Miami Residence*

40. Narcotics proceeds were also used to pay property taxes owed on **Defendant Property 2**, which is real property located at 12210 SW 103rd Terrace, Miami, Florida and Dr. Falcon's primary residence.

41. On or about April 18, 2016, an electronic payment from Falcon TD Bank Account No. 1804 for approximately $10,362.20 was made to satisfy 2016 Miami-Dade County property taxes owed on **Defendant Property 2**.

42. In addition, on or about April 4, 2017, and on or about April 5, 2018, two electronic payments from Falcon BoA Account No. 8072 totaling approximately $29,551.50 were made to satisfy 2016 and 2017 Miami-Dade County property taxes owed on **Defendant Property 2**.

*3. Defendant Property 3: Placida House*

43. **Defendant Property 3,** which is located at 8470 Marsh Street, Placida, Florida, was purchased and also maintained with narcotics proceeds from Falcon TD Bank Account No. 1804 and Falcon BoA Account No. 8072.

44. On or about June 30, 2017, and on or about September 19, 2017, a check and a wire transfer from Falcon TD Bank Account No. 1804 totaling approximately $160,000 funded the purchase of **Defendant Property 3**.

45. On or about September 19, 2017, a wire transfer in the amount of approximately $3,526.18 from Falcon BoA Account No. 8072 also funded the purchase of **Defendant Property 3**.

46. In addition, between on or about December 5, 2017, to at least on or about May 4, 2018, six wire transfers from Falcon BoA Account No. 8072 totaling approximately $15,904.68 were made to satisfy mortgage payments for **Defendant Property 3**. Additional funds from this account also paid for certain utility bills for **Defendant Property 3**.

47. On or about April 6, 2018, a wire transfer from Falcon BoA Account No. 8072 totaling approximately $3,854.49 paid for Charlotte County property taxes owed on **Defendant Property 3**.

**E. <u>Bella Worldwide</u>**

48. In or around August 2016, agents from the Drug Enforcement Administration ("DEA") issued an administrative subpoena to PCCB for patient files.

49. Shortly thereafter, titles to **Defendant Property 1** and **Defendant Property 2** were transferred to Bella Worldwide Corp. ("Bella Worldwide").

50. Specifically, Dr. Falcon had acquired title to **Defendant Property 1** on or about June 3, 2015. On or about November 3, 2016, nominal title to **Defendant Property 1** was transferred, via quitclaim deed, from Dr. Falcon to Bella Worldwide.

51. In the same manner, on or about November 3, 2016, title to **Defendant Property 2** was transferred, via quitclaim deed, from Dr. Falcon's son to Bella Worldwide.

52. Finally, **Defendant Property 3**, which was acquired after DEA agents issued an administrative subpoena to PCCB, was purchased in the name of Bella Worldwide.

53. On the deeds to the **Defendant Properties**, Bella Worldwide is identified as a Belize corporation, with a post office address in Nassau, Bahamas. Elsewhere, the address for Bella Worldwide has been identified as 12210 SW 103rd Terrace, Miami, Florida, which is **Defendant Property 2** and Dr. Falcon's residence.

54. Narcotics traffickers and money launderers often use foreign shell companies to facilitate their laundering activities and to conceal the nature, source, location, and ownership of their assets.

## IV. BASIS FOR FORFEITURE

### A. Underlying Federal Offenses

55. Pursuant to 21 U.S.C. § 841(a)(1), it is a federal crime for "any person knowingly or intentionally— . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." It is unlawful for a physician to dispense or distribute controlled substances outside the course of professional practice and for no legitimate medical purpose.

56. Pursuant to 21 U.S.C. § 846, it is a federal crime for "[a]ny person who attempts or conspires to commit" a violation of 21 U.S.C. § 841(a)(1).

57. Pursuant to 31 U.S.C. § 5324, it is a federal crime for a person, for the purpose of evading federal reporting requirements, to cause or attempt to cause a domestic financial institution to fail to file a report, to cause or attempt to cause a domestic financial institution to file a report that contains a material omission or misstatement of fact, or to structure or assist in structuring, or attempt to do so, any transaction with one or more domestic financial institutions.

58. Pursuant to 18 U.S.C. § 1956(a)(1), it is a federal crime for a person "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, [to] conduct[] or attempt[] to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity— . . . knowing that the transaction is designed in whole or in part— (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law."

59. Pursuant to 18 U.S.C. § 1957, it is a federal crime for a person to "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity."

**B. <u>Applicable Forfeiture Statutes</u>**

60. Pursuant to 21 U.S.C. § 881(a)(6), "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance . . . in violation of [21 U.S.C. §§ 841(a)(1), and 846], [and] all proceeds traceable to such an exchange" are subject to forfeiture.

61. Pursuant to 31 U.S.C. § 5317(c), "[a]ny property involved in a violation of [18 U.S.C. § 5324], or any conspiracy to commit any such violation, and any property traceable to any such violation or conspiracy" is subject to forfeiture.

62. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. §§ 1956 or 1957], or any property traceable to such property" is subject to forfeiture.

**FIRST CLAIM**
(21 U.S.C. § 881(a)(6))

63. The factual allegations in paragraphs 6 through 54 are re-alleged and incorporated by reference herein.

64. The **Defendant Properties** are subject to forfeiture to the United States, pursuant to 21 U.S.C. § 881(a)(6), as proceeds traceable to an exchange of moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person for a controlled substance in violation of federal narcotics trafficking offenses set forth in 21 U.S.C. §§ 841(a)(1) and 846.

**SECOND CLAIM**
(31 U.S.C. § 5317(c))

65. The factual allegations in paragraphs 6 through 54 are re-alleged and incorporated by reference herein.

66. The **Defendant Properties** are subject to forfeiture to the United States, pursuant to 31 U.S.C. § 5317(c), as property involved in a violation of federal structuring offenses set forth in 31 U.S.C. § 5324, and/or as property traceable to such violation.

**THIRD CLAIM**
(18 U.S.C. § 981(a)(1)(A))

67. The factual allegations in paragraphs 6 through 54 are re-alleged and incorporated by reference herein.

68. The **Defendant Properties** are subject to forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A), as property, real or personal, involved in a transaction or attempted

transaction in violation of money laundering offenses set forth in 18 U.S.C. §§ 1956 and/or 1957, and/or property traceable to such property.

***WHEREFORE,*** Plaintiff, the United States of America, requests that any and all persons having any claim to the **Defendant Properties** be directed to file and serve their verified claims and answers as required by Rule G(5) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, or suffer default thereof, and further requests that this Honorable Court execute a Writ of Entry for the purposes of conducting an inspection and inventory of the **Defendant Properties**, declare the **Defendant Properties** condemned and forfeited to the United States of America, and for such other and further relief as this Court may deem just, necessary, and proper.

Respectfully submitted,
BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

By: *s/ Nalina Sombuntham*

Nalina Sombuntham
Assistant United States Attorney
Fla. Bar No. 96139
99 N.E. 4th Street, 7th Floor
Miami, Florida 33132-2111
Telephone: (305) 961-9224
Facsimile: (305) 530-6166
nalina.sombuntham2@usdoj.gov

Dated: July 24, 2018.

# ATTACHMENT A

The Defendants *In Rem* are:

(i) Real property located at 5555 Collins Avenue, Unit 12A, Miami Beach, Florida 33140, including all buildings, fixtures, appurtenances, improvements, attachments and easements found therein or theron ("**Defendant Property 1**"), which is more fully described as:

> Unit 12-A, of OCEANSIDE PLAZA CONDOMINIUM, a Condominium according to Declaration of Condominium thereof, recorded in Official Records Book 10102, Page 365, of the Public Records of Miami-Dade County, Florida, and any amendments thereto, together with its undivided share in the common elements.
>
> Parcel ID No. 02-3214-010-0100;

(ii) Real property located at 12210 SW 103rd Terrace, Miami, Florida 33186, including all buildings, fixtures, appurtenances, improvements, attachments and easements found therein or theron ("**Defendant Property 2**"), which is more fully described as:

> Lot 5, Block 1, SUMMIT PARK ESTATES, according to the map or plat thereof, as recorded in Plat Book 108, Page 2, of the Public Records of Miami-Dade County, Florida.
>
> Parcel ID No. 30-5901-013-0050; and

(iii) Real property located at 8470 Marsh Street, Placida, Florida 33946, including all buildings, fixtures, appurtenances, improvements, attachments and easements found therein or theron ("**Defendant Property 3**"), which is more fully described as:

> Begin at the NE corner of Lot 1 of Block "1" of W.A. McElya's Subdivision of Little Gasparilla Island; thence run Westerly along the South right-of-way of Marsh Street a distance of 450 feet to the Point of Beginning; thence a 90 degree angle left and run a distance of 50 feet to a point; thence a 90 degree angle right and run to the Gulf of Mexico; thence run Northerly along the shore line of the Gulf of Mexico to the South side of the right-of-way of Marsh Street; thence run Easterly along the South right-of-way of Marsh Street to the Point of Beginning.
>
> Parcel ID No. 422016480001.

# VERIFICATION

I, Guillermo Cuba, hereby verify and declare under penalty of perjury that I am a Task Force Officer with the Drug Enforcement Administration ("DEA"), that I have read the foregoing Verified Complaint for Forfeiture *In Rem* ("Verified Complaint") and know the contents thereof, and the matters contained in the Verified Complaint are true to my own knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Task Force Officer of the DEA.

I hereby verify and declare under penalty of perjury that the foregoing factual allegations are true and correct to the best of my knowledge and belief.

Executed on this 23 day of July, 2018.

Guillermo Cuba
Task Force Officer
Drug Enforcement Administration